ELIZABETH CLARKE *et al.*

*v.*

ELBERT W. SHIRK *et al.*

*Opinion filed November 8, 1897.*

1. EVIDENCE—*construction of contract is not a matter for proof by witnesses.* An experienced builder and contractor may testify as to the accepted meaning among builders of technical words used in a contract for erecting a building, but it is not permissible to prove by such witness the proper construction of the entire contract.

2. CONTRACTS—*when provision of building contract is not complied with.* A provision in a contract for the erection of a building by a lessee, that the plans and specifications should be submitted to the lessor for approval before beginning the work, is not complied with by submitting a pencil sketch, without specifications.

3. SAME—*when party is not in default for not making payment under building contract.* Where a lessee who is erecting a building for the lessor materially changes the plan of the building without the lessor's knowledge or consent, the latter is not in default for refusing to make payment until the unauthorized change is rectified.

APPEAL from the Circuit Court of Cook county; the Hon. M. F. TULEY, Judge, presiding.

This was a bill in chancery, filed in the circuit court of Cook county by Elizabeth Clarke and others, as heirs-at-law of Dr. Franklin D. Clarke, deceased, the appellants, against Elbert W. Shirk and others, the appellees, praying for the delivery up and cancellation of a certain lease, re-conveyance of the premises, and other relief.

The facts leading up to the filing of this bill, as set out in the pleadings and shown by the evidence, are as follows: Dr. Clarke, in his lifetime, was the owner of certain property in Chicago known as No. 333 Michigan avenue, and on May 28, 1891, entered into an agreement with appellee Shirk for the sale of this property to Shirk, Clarke to furnish him, as soon as possible, an abstract of title showing a good and merchantable title, clear of all incumbrances, and on approval of the same by Shirk's counsel, Clarke to deliver a sufficient warranty deed for

the same on payment of $40,000, which sum was stipulated
to be "in full payment of said property." The abstract
was delivered June 3 and approved June 5, but the sale
was not consummated until July 19, 1891, on account of
delay experienced in getting some mortgages on the prop-
erty released. The agreement further provided that Shirk
should make, and Clarke accept, a ninety-nine year lease
of the property, at an annual rental of $6000, payable in
gold, semi-annually in advance, this ground rent to begin
June 1, 1891, and the lease and deed to be delivered at
the same time. The agreement further specified that the
lease should provide for the erection by Clarke of a thor-
oughly fire-proof apartment or flat-building, to cover the
entire frontage of the lot, (fifty feet,) and to be not less
than eighty-five feet (subsequently changed to ninety-
five feet) in depth, and not less than eight (subsequently
changed to ten) stories in height, to be constructed of
"steel, brick, terra cotta and granite," the plans and speci-
fications to be examined and approved by Shirk before
the construction of the building should be commenced;
that if, within the time limited in the lease, (which should
be before January 1, 1892,) five stories of this building
should be erected and completed as far as possible with-
out the roof being on, all the material and labor used and
employed up to that time being fully paid for, so that
the building would be free from all claims and liens, then
Shirk would pay Clarke, "in further consideration for the
conveyance aforesaid," the sum of $15,000 in cash; and
further payments were provided for as the building pro-
gressed, on the same conditions, until its completion, ag-
gregating in all $60,000,—all these payments to be made
on the certificates of the architect that the terms of the
lease had been complied with, the architect to be agreed
upon by both parties. The agreement further recited that
"the principal cause moving said party of the first part
[Shirk] to purchase the aforesaid land is the execution of
the aforesaid lease, and the expectation that the building

therein specified will be fully erected and completed in conformity with the terms and conditions of said lease, so that the same will be a substantial and adequate security for the payment of the rent therein specified, and the performance of the other conditions in said lease contained, on the part of said lessee; and it is expressly understood and agreed that the said sum of $40,000 * * * is and shall be in full payment and satisfaction of the whole purchase price of said land," and that the additional payments, amounting to $60,000, "are to be taken and considered as additional consideration for the said land because of the erection and construction of the said building in accordance with the terms and provisions of said lease, and for no other reason, and that unless said party of the second part [Clarke] shall become entitled to the payment of the said sums, respectively, as aforesaid, the said party of the first part shall be under no obligation of any kind to make any further or other payment or consideration for the said land, except the said sum of $40,000."

The lease was executed substantially as agreed upon, and contained covenants requiring Clarke to pay all taxes and assessments, to repair or re-build in case of fire, so that the building, when repaired or re-built, should be worth in cash not less than $125,000, and that on default in the payment of rent for sixty days, or on the violation of any of its covenants or agreements, a notice of intention to forfeit the lease should be served on the lessee, and that fifteen days after the service of such notice such forfeiture might be declared in writing, and should operate as a complete and irredeemable forfeiture to Shirk of the entire interest of Clarke in and to the demised premises, and the buildings and improvements thereon, as damages agreed upon and liquidated; that at the expiration of the ninety-nine years the party of the first part should purchase the improvements then situated upon the premises at one-half their fair cash value, etc.

In the latter part of July, 1891, William G. Barfield, who was the architect mutually agreed upon, submitted to Shirk a pencil sketch of the building to be erected, which Shirk approved.  This sketch provided for what is known as steel construction, the walls to be of steel columns; but on learning that the building ordinances of the city of Chicago would not permit the party walls to be so constructed, but required them to be of solid masonry, the architect and Clarke changed not only the outside walls, but also inside walls, to solid masonry, without apprising Shirk of this fact, who remained ignorant of the change till in December, 1891, when he was passing the property and noticed it.

Dr. Clarke died October 20, 1891, and the estate undertook to carry out the contract.  No specifications were submitted to Shirk for approval until November, 1891, although he had written the architect for them a number of times before, stating in his letters that they might not be satisfactory to him, in which case changes would be necessary and additional expense entailed.  On October 20, 1891, Barfield wrote to Shirk, saying that he had been unable to do anything or go forward in any way because the doctor had not secured the amount necessary to carry the building to the fifth story.  In November Barfield sent some specifications to Shirk, but Shirk claimed that the only specifications sent were those of the mason work.  Later, Shirk returned to Chicago and had several conferences with the architect.  The only objection that he made and insisted on was to the solid inside walls, he insisting on having them of steel construction, his objection being that solid brick walls took up too much room.  Work was stopped in January, 1892, after the foundations had been put in, on account of the failure of the Clarke estate to pay for the work done, as is alleged by appellees; as alleged by appellants, because Shirk refused to tell what kind of a building he wanted put up.  Negotiations between the parties were in progress during the

next few months to come to some understanding or agree-
ment by which the building could be put up, Shirk agree-
ing to an extension of the time, he having previously
already agreed to an extension to July 1, 1892. Several
attempts were also made to get other parties interested
in the lease, but they all came to nothing. The work
done on the building and the material furnished amounted
to about $42,000, for which the contractors got judgment
in the probate court against the estate of Dr. Clarke.

The bill alleges that the complainants have been will-
ing and able to carry out the contract, but have been
hindered and thwarted in their endeavor to do so by the
fraudulent and wrongful acts and conduct of Shirk. Shirk
filed a cross-bill, setting up a declaration of forfeiture,
and praying for a forfeiture as provided in the lease.
The bill was subsequently amended, issues made up and
a trial had before the court, and a decree entered finding
the equities with the appellees and dismissing the bill
for want of equity, and dismissing, also, the cross-bill,
without prejudice to appellees' remedy at law. From
this decree appellants have appealed to this court.

JOHN M. GARTSIDE, FRANK P. LEFFINGWELL, and
JOHN W. WALSH, for appellants.

ULLMANN & HACKER, for appellees.

Mr. JUSTICE CARTER delivered the opinion of the court:

The questions for determination in this case are prin-
cipally questions of fact. The cause was heard in the
court below mainly upon testimony given orally before
the chancellor, and the decree ought not to be disturbed
unless it appears that a wrong conclusion was reached.

We cannot agree with appellants in their contention
that the evidence shows that the appellee Shirk failed or
refused to comply with the contract on his part, thereby
entitling appellants to have the same rescinded. On the
contrary, we think the record shows that the appellants

themselves failed to comply with and carry out the pro-
visions of the contract and lease which Dr. Clarke had
undertaken to perform. By the terms of the contract the
plans and specifications were to be approved by Shirk,
but, after he had approved a pencil sketch of the plans
submitted to him by the architect, the work was com-
menced before the specifications were presented to him
and before he had any opportunity to approve them, and
work was entirely suspended in January, 1892, before
enough was done to call for the first payment from Shirk,
under the contract, and has never since been resumed.
This bill was filed in September, 1892. Appellants, as
Clarke's representatives, undertook to carry out the con-
tract after his death, but failed to do so, and we do not
think the evidence shows that such failure was brought
about by the fault of Shirk. The evidence shows that
just before the work was suspended on the building the
architect wrote to the different contractors, directing
them to suspend work until Mrs. Clarke should pay a
certificate which he had issued to the contractor for the
masonry, showing that he was entitled to a payment of
about $10,000. True, this contractor testified that he did
not stop work because this certificate was not paid, but
because other contractors refused to go on, and because
he could not proceed with his work independently of
others. He testified, also, that he was advised by his
attorney to go on with the work. The others stopped
because they were ordered to do so by the architect. The
appellants claim that they were willing and able to pay
for the materials furnished and work done, but did not
want to pay unless Shirk would signify his approval of
the plans and specifications, or tell what he did want.
They never did, however, pay for any of the work.

There is no showing in the record of the assets of the
Clarke estate. The $40,000 Clarke received for the land
was nearly all consumed in paying off the mortgages,
brokerage fees, etc. Mrs. Clarke stated to the witness

Tharp that she could not go on and complete the building; that a sale of horses at the stock yards did not turn out nearly as much as she anticipated and that a stock of jewelry did not bring as much as she thought it would. The claims on account of this building allowed in the probate court amounted to $42,000, and not much more than the foundation and basement was completed. Nothing was ever paid on these bills, either by Dr. Clarke or the estate. The efforts made to get other parties interested in the lease show that the estate did not feel able to carry on the enterprise alone. Shirk declared his willingness to extend the time for finishing the building, but wanted it built according to contract, in a way that he could approve, and wanted to be certain of the financial ability and responsibility of the party that would undertake to fulfill the contract. There seems to have been but one person who was ever seriously put forward as such a party,—one Ingram, now living in Texas, but whom Shirk did not consider financially responsible, and whose statements, as preserved in the record, are, to say the least, rather inconsistent with each other and vague as to his financial standing.

The principal difference between Shirk and appellants as to the plans and specifications seems to have been the contention as to the character of the inside walls of the building. As we have seen, Barfield's original pencil sketch showed all steel superstructure, which was accepted by Shirk. But afterward it was found that the north and south walls of the building, as party walls, were required to be of solid masonry by the city ordinances, and Dr. Clarke and Barfield accordingly changed not only these walls, but also the inside walls, to masonry, without notifying Shirk or getting his approval. To these inside walls Shirk objected as soon as he became aware of their character, and has always strenuously maintained that they must be of steel construction, objecting also to the iron work that was being put into

the building, and claiming that the lease called for steel only.   By the terms of the lease the building was to "be constructed of steel, brick, terra cotta, stone and granite."  Barfield, appellants' architect and main witness, testified that the plans and specifications were not in accordance with the terms of the lease as to the kind of building to be constructed; that the lease did require steel walls, as he understood it; that the difference in cost would have been about $1200; that brick would have been that much cheaper than steel; that it was not true that Shirk had at any time refused to approve the plans when presented to him.

It seems clear to us that Shirk was not to blame for the discontinuance of the work.   He at no time ordered it stopped, but insisted that he wanted the building constructed according to agreement.  His letters and conduct seem to evince a desire to have the work done promptly, and to do all he could to expedite the same by examining the plans and specifications, if they were only presented to him.   He wrote repeatedly about them.   Appellants claim that he was chargeable with notice after having received the plans and specifications, in November.   On this point there is a direct conflict of evidence, Shirk saying that he only received specifications for the masonry work, and Barfield that he had sent specifications of the cut-stone and plumbing work also.   The contracts, however, had been let by Barfield before any specifications were even sent to Shirk for approval.   Taking all the testimony together, we do not find that Shirk was estopped from insisting on his right of approving the specifications, and that the contention of appellants that he avoided passing upon the plans and specifications, and that he acted fraudulently and not in good faith in the matter, is not borne out by the record.

It is insisted by appellants that the trial court erred in refusing to allow them to prove by an expert contractor and builder that the lease and contract did not call for a

building of steel construction. Appellants' offer was as follows: "We now offer to prove by Mr. George A. Fuller, who is here in the court room, and who is an old resident of Chicago and a practical builder and contractor of many years' experience, and who has probably built more of the high modern buildings than any other person in Chicago, that the ground lease and the contract involved herein do not provide for a building of steel construction." The court properly held that it was the province of the court to construe the contract and lease. It will be observed that the offer was, not to prove by expert testimony the meaning in the art or trade of building of technical words used in the lease and contract, so as to enable the court, in the light of such testimony, to put the proper construction upon them, but the offer was to prove by expert testimony what the proper construction of the entire contract and lease was with reference to whether the building was to be one of steel construction or not. If there was any ambiguity in the contract in the respect mentioned, the court would consider the evidence tending to prove the interpretation which the parties themselves had given the contract and lease, and the expert testimony, as offered, would not have been proper, as it would, for this reason and others apparent, have invaded the province of the court.

It is apparent, we think, that the contract was a hard one for Clarke, and that upon his death his representatives were unable to carry it out, but we cannot on that account, under the bill and evidence in this case, rescind it and compel a re-conveyance of the property by Shirk, as prayed in appellants' bill. The bill was properly dismissed for want of equity. The cross-bill was also properly dismissed without prejudice, for if appellee Shirk is entitled to a forfeiture he has a remedy at law. Equity does not look with favor upon forfeitures.

Finding no error, the decree will be affirmed.

*Decree affirmed.*